January 9th, 1862.


# SUPREME COURT—IN ADMIRALTY.


## JOHN RICE vs. THOMAS SPENCER.

SEAMEN in the whaling business, before bringing a suit for their share of the proceeds of the voyage, are required to make a démand of settlement, and it is the duty of the owner or his agent to make out the accounts, the accurate knowledge of the data of settlement being with him and not with the seamen.

In the absence of any contract with the seaman, the lay should be the highest out of the port for good men in the same capacity.

The libellant having quitted the vessel during the cruise without reasonable cause, but at the same time with the acquiescence of the master, was held entitled to his share of the catchings in the proportion of the time he was engaged in the service to the whole time of the cruise.

It is a custom applicable to American whaleships, that in the absence of a stipulated price, the prices for the products of the whale fishery fixed by the American Consulate at Honolulu are to govern in the settlement of the voyages of seamen who ship to be discharged at this port.

ALLEN, C. J.

This is a libel for seaman's wages.

It is alleged that the libellant made an engagement with the respondent, owner of the bark "Florence," in the spring of 1860, at Honolulu, to proceed to sea and join said bark as boat-header as soon as he should fall in with her, but that no engagement in writing was entered into for his remuneration, but he was to have equal to the best, which the libellant alleges to be 1-18th of the entire proceeds of the voyage during the time libellant served on board said bark. In pursuance of this agreement, the libellant proceeded to sea in a vessel called the "Levi Starbuck," and joined the "Florence" at Saypan. It is further

alleged that he did not sign articles, but it was understood that this port was to be the place of settling the contract. It is further alleged that he faithfully performed his duty till September 2d, when having had some disagreement with the mate, who threatened to leave the Florence, if he did not, and to avoid difficulties and any possible injury to the voyage, left the vessel, with the full concurrence of the master, and repaired on board the " Levi Starbuck," on which vessel he arrived in this port. The libellant further avers that the " Florence " was attended by the schooner " Alice," in both of which vessels he was entitled to a share. That the catch turned out at New Bedford 25,654½ gallons of oil, and 12,770 pounds of bone, the net sales of which was $17,301 05, and that he is entitled to 1-18th of said proceeds.

The respondent admits that he fitted the " Florence " for a whaling voyage, and avers that on the application of the libellant, who was in want of labor for the support of his family, offered him a berth as supernumerary on said vessel, of which he gladly availed, and he proceeded to sea as alleged and joined the " Florence."

The respondent further admits that no articles or other agreement was signed, and that libellant went into the northern seas and labored in the service agreed upon, and that said " Florence " was attended by the schooner " Alice;" and that the libellant is entitled to a *quantum meruit* for his services on both vessels, but denies that he is entitled to a share of the entire catch of the season, he having assisted only in the catching of a minor part. The respondent denies that he is entitled to an 1-18th lay of the proceeds of said voyage, or that he has ever asked for a settlement ; but, on the contrary, the respondent avers that he has made repeated efforts for a settlement without success.

It appears in evidence that efforts at settlement have been made by the parties, but without success, from a disagreement in relation to the rate of compensation. I regard it the duty of seamen in this class of cases to make a demand of settlement and payment before a suit ; but it is incumbent on the master, agent or owner, as the case may be, to make out the account according to the share of the amount of oil and bone taken, less

the advances. The accurate knowledge of the data of settlement is with him and not with the seaman. If he makes such an account and presents it to the seaman, and tenders him a sufficient sum to cancel the amount, he will be exonerated; but when, as in this case, there is an unsuccessful effort at settlement, I regard it a full discharge of duty, a sufficient demand, and unless a tender is made by the other party, or some act done as is equivalent thereto, the seaman is rightfully in Court.

It is admitted that there was no written contract, and while it is alleged by the libellant that he was to have the best lay of any in port, it is averred by the respondent that he was to have a fair and reasonable compensation. It is to be regretted in all contracts, but especially in contracts of this nature, that they are not in writing; but the admiralty regard it more especially the fault of the master, and therefore always gives the benefits of any uncertainty to the seaman. It is contended that the libellant is entitled to the highest rate of wages paid at this port, as there was no contract in writing, and his counsel refer to the case of the " Crusader " (Ware's Rep., 437), which sustains this position. But it is maintained by the respondent that he was taken as a supernumerary, and therefore should have only a medium lay.

It appears by the evidence of Captain Long that he had employed the libellant in his ship, in the whaling service, for four seasons, and he gave him one-eighteenth lay and $24 per barrel for oil and bone taken; that he was one of the best men in that service. He says further that on the 17th day of July he went on board the " Florence," in the Ochotsk Sea, and having an inefficient mate on board his own ship, he made application to the master, Captain Spencer, for the libellant, but from some cause not stated he did not engage with Captain Long. He says he should have given him the same lay as before. It is clearly proved that he rendered efficient service, having taken five of the thirteen whales taken by the " Florence " and the schooner. It is further in proof by Captains Waterman and Green, gentlemen of experience in the business, and acquainted with the libellant as a whaleman, that he would be entitled to one-twentieth lay of both ships, and to be paid off at the Consular prices, if there was no agreement for other terms. It is

clear, in the mind of the Court, that he merits the highest lay of any of that class of men out of the port, which is one-eighteenth.

The next question which arises is, where is the place of settlement? It is alleged that it should be made here, where the agreement for service was made, and there being no proof to the contrary, I should regard this as the proper place, because the cruise terminated here, and especially as he had made no legal contract he was entitled to leave the vessel here, and with this I do not see the propriety of the allegation that the libellant should be paid his lay in the net proceeds of the oil and bone at New Bedford. It is alleged that Honolulu was to be the place of settling the contract; if so, it is very clear that the settlement was to have been made as soon after the arrival of the ship as the settlement of the voyage could be made up. As the case appears, the master and owners of the "Florence" are responsible for a settlement here, and had the oil been lost on the passage to New Bedford, the libellant would probably have thought a singular construction of his agreement that he should bear the loss, and be answerable for the advances he had received. The Court is clear in the opinion that in the absence of a contract, and where a cruise is made, the lay should be the highest out of the port for good men in the same capacity, and that the payment should be where the cruise terminates.

It appears in evidence that the libellant did not join the "Florence" on her departure from this port, but sailed from here for that purpose on the 12th January, 1860, and although there is some discrepancy in the testimony in relation to the time when he left the vessel, the weight of testimony is that it was on the 2d day of September. Had the respondent thought proper to present the log-book, perhaps more accuracy might have been attained. The fourth mate, who was attached to the schooner, testifies that he was on board the ship the last of August or beginning of September, and the libellant was on board the ship at that time, and that when the schooner was hauled up he went on board the ship, which was the last of September, and Mr. Rice was not there.

It is contended that he should have his lay for the time he

was engaged in the cruise, and the additional time required to make the voyage.from the Sea when he left the ship to this port. It is in evidence that there was a disagreement between the libellant and the mate of the ".Florence ;" each complained to the Captain and expressed a desire to leave, but the Captain said to the libellant that he had better remain and go on in his work as before, and it would all be right. He did not refuse him liberty to leave ; and the only question is whether there was such a course of treatment as justifies a man in his capacity leaving the vessel, and yet claiming pay for the balance of the cruise. There was no severity from the master, and no oppressive conduct on the part of the mate. It was merely an unpleasant difference with him. I think the Captain should have settled the difference for them, but as he did not interfere, the libellant thought proper to leave and join the "Levi Starbuck" for the remainder of the season. On what terms he joined this ship does not appear—he may have earned wages on that vessel. Be that as it may, it is not in evidence that there was any necessity for his leaving the "Florence ;" it was a matter of feeling ; he preferred another vessel, as is often the case. As the master did not object to his leaving, he is entitled to his earnings while engaged in the service of the ship, but no longer.

It is contended further, that he should only be entitled to his lay in the catchings while he was on board. There is usually in the shipping articles a stipulation to that effect. In the whale-fishery, by the terms of the usual articles, the legal representatives of a mariner, dying during the voyage, are entitled to such part of the whole amount of his stipulated share as the time of his services on board shall be of the whole term of the voyage.

Whether it is in the shipping articles of the "Florence " I do not know, as they were not produced. The service commences when the vessel leaves port, and it continues as long as. the seaman is on board. Catching the whale is only a part of the service, and frequently much less severe than in taking care of the oil and in aiding in the general management of the ship in heavy weather ; valuable time is consumed in the necessary service of reaching the fishing ground. There are

John Rice *v.* Thomas Spencer.

other considerations which favor payment according to the time of service on board in the absence of any agreement. The contract of the whaleman is based on mutual aid, not on individual effort, while it is designed to enlist the generous co-operation of all on board.

In this business the ship, with her supplies and outfits, the master and officers and men are all requisite for its success— all by their contract, whether expressed or implied, are bound to contribute for the general object. There may be, at times, great success for a few weeks, and none whatever for months, although all are laboring with equal assiduity for that purpose. Indeed, most of the whales in the northern sea are taken within a period which is usually not more than half the time consumed in the whole cruise. At times it would operate very advantageously for the seaman, but then he would be receiving money for which he had not labored or expended his time. I am aware that there are many cases where men are engaged at sea when the parties are employed in this labor, and are paid according to the amount taken while on board. But this is by special contract, and in such cases the seaman has usually worked his passage there. But, as a principle, I know of no provision more equitable than that contained in the shipping articles of most, if not all, of the American ships in this service. Therefore the libellant is entitled to his share of the catchings, in the proportion of the time he was engaged in the service to the whole time of the cruise.

Had the libellant left the ship for cause, he would have been entitled to his lay for the whole cruise, or had he left her without cause and against the consent of the master, he would not have been entitled to any portion of his lay; but exercising his preference, and with the acquiescence of the master, I regard a just compensation due him, according to the time he was virtually attached to the ship.

Although he did not leave this port for about one month after the "Florence" had sailed, yet I am satisfied, from the evidence, that he had entered into an engagement to ship in her before she sailed, and this liberty to remain at home for a while was doubtless given as a matter of accommodation to libellant, with the full understanding that he should join her in season

for the whaling service, and had he returned in the vessel there would have been no pretence for curtailing his lay on account of this delay in sailing. It was equally well for the voyage, as far as appears, that he joined the "Florence" at Saypan, as at Honolulu. Therefore, I am of the opinion he is entitled to his proportion of the catchings, which the time bears from the day of the sailing of the "Florence" to the 2d day of September, when he left her, to the whole time of the cruise.

This will be about the ratio as contended for by the respondent. The next question which arises is the price of oil and bone at which a seaman should be paid, when there is no agreement, as in this case.

The libellant alleges he should be paid his lay in the net proceeds of the catchings at New Bedford. If the contract was for the voyage, which was to terminate there, and the seaman completed it, then, of course, this would be the proper basis of settlement, but as the contract was made here and terminates here, the seaman is legally entitled to be paid here. Any other rule than this would be oppressive upon the seaman in most cases, and wholly contrary to his expectations when entering on the service. If, then, this is the case, at what price of his share in the catchings should the settlement be made in the absence of an agreement? The testimony of Messrs. Waterman and Green is that when there is no stipulation the understanding is that payment should be made at the Consular prices of the oil and bone taken. I regard this as a custom as applicable to the American ships, that in the absence of a stipulated price, the prices fixed by the American Consulate are to govern. When a man ships, or agrees to ship, on an American whaleship, it is universally understood that he is to be paid off at these rates. The share, or lay, is fluctuating, but the price is fixed for the season's catch. The object and intent of the law in giving the highest rate of wages out of the port, when no contract in writing is made, is to secure the seaman his rights as well as in a well-defined contract. But in the American whaling service the price is certain, as fixed by the American Consul at this port.

The master will make up the account according to these principles, with interest on that amount from December 1st, 1860,

the vessel having arrived on the 19th of November, which gives a reasonable time to make a statement of the account, unless for special reasons more time is necessary, which, it is not alleged in this case, was required; and, also, with interest on the payments made by respondent from the day of their date, except on the first two items, amounting to $120, which I regard as a seaman's advance.

C. C. Harris, for libellant.

J. Montgomery, for respondent.